OPINION
{¶ 1} Defendant-appellant Carlos Ford appeals from his conviction and sentence, following a no-contest plea, for possession of less than one gram of crack cocaine. Ford contends that the trial court erred when it denied his motion to suppress. We conclude that the police officer conducting the search had a proper basis for stopping Ford, that when Ford ran away and was captured, in an area in which drug crimes were known to occur, the police officer had a proper basis for conducting a limited weapons pat-down, and that even if Ford was in custody for purposes of Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694, when the officer asked him whether "he had any knives, needles, [or] any type of weapon," Ford's statement "that he had a piece of crack cocaine in his right front pocket," was a volunteered statement, not responsive to the question, and was therefore not the product of a Miranda violation. Accordingly, we conclude that the trial court did not err when it denied Ford's motion to suppress, and the judgment of the trial court is Affirmed.
 I {¶ 2} Dayton police officer Stephen Clark observed Ford walking on Interstate 75 at about 7:25 one October evening in 2001. Clark had responded to a dispatch "that there was a black male walking northbound on I-75 weaving in and out of traffic."
 {¶ 3} Clark described his encounter with Ford as follows:
 {¶ 4} "Q. And what did you do when you observed the individual on the exit?
 {¶ 5} "A. I exited my cruiser. I advised dispatch that I was about to make contact with the gentleman. It was unknown if the gentleman had a car broken down or what the circumstances were to the fact that he was walking on the interstate.
 {¶ 6} "As he approached me, he motioned to me with his hand as to —
 {¶ 7} "Q. Let me stop you. How far was he from — from you when he made — made this hand motion?
 {¶ 8} "A. Approximately fifteen to twenty feet.
 {¶ 9} "Q. And can you describe and show to the Court what type of motion he made to you?
 {¶ 10} "A. As to come here — [Indicating].
 {¶ 11} "Q. So you — for the record, you're indicating he waved toward — for you to come towards him?
 {¶ 12} "A. Correct.
 {¶ 13} "Q. And what did you do when you received this indication from this individual?
 {¶ 14} "A. He was still, uh . . . continuing to walk towards me. I asked him if he was okay, he stated yes. Uh . . . I remained at my cruiser. As he got within approximately ten feet from me, he began running, uh . . . off of Hillrose eastbound onto Windham.
 {¶ 15} "Q. And what did you do when you saw him run?
 {¶ 16} "A. I pursued him on foot.
 {¶ 17} "Q. And which way did the Defendant run while you were in pursuit?
 {¶ 18} "A. Eastbound on Windham.
 {¶ 19} "* * * *
 {¶ 20} "Q. Were you able to catch up with him?
 {¶ 21} "A. Yes, I was.
 {¶ 22} "* * * *
 {¶ 23} "Q. When you saw the Defendant take off running, what were your thoughts at that point in time?
 {¶ 24} "A. I had unknown circumstances as to why he was on the interstate due to the fact that I was unable to confirm whether there was a disabled vehicle or what the circumstance was. And then I have a gentleman running from me for an unknown reason.
 {¶ 25} "Uh . . . I notified dispatch that I was, uh . . . pursuing him on foot and other crews responded.
 {¶ 26} "Q. And this area where he was running on Windham, do you generally — or in the course of your duties patrol this area?
 {¶ 27} "A. Yes.
 {¶ 28} "Q. What type of area is this?
 {¶ 29} "A. It's a business area.
 {¶ 30} "Q. And from — how long you been patrolling this area?
 {¶ 31} "A. Four years.
 {¶ 32} "* * * *
 {¶ 33} "Q. And in your four years of patrolling this area, has it come to your attention that there's crimes that occur in this area?
 {¶ 34} "A. Yes.
 {¶ 35} "Q. What type of crimes?
 {¶ 36} "A. Drug and prostitution.
 {¶ 37} "Q. And have you made criminal arrests in this area?
 {¶ 38} "A. Yes, I have.
 {¶ 39} "Q. And do any of these arrests involve any type of weapons or contraband?
 {¶ 40} "A. Yes.
 {¶ 41} "Q. When you pursued him on foot, I believe you indicated you were able to catch up with him?
 {¶ 42} "A. Yes.
 {¶ 43} "Q. How did that occur?
 {¶ 44} "A. By chasing him on foot. As I caught up to him, uh . . . he was placed on the ground. I was assisted by an off-duty Ohio State Trooper which assisted me in handcuffing him. At which point I asked him if he had any . . .
 {¶ 45} "Q. Let me stop you there. The Defendant's on the ground?
 {¶ 46} "A. Yes.
 {¶ 47} "Q. And did you handcuff him?
 {¶ 48} "A. Yes.
 {¶ 49} "Q. And what was your reason for handcuffing him?
 {¶ 50} "A. I had unknown circumstances as to why he ran from me. I was unsure if he had any type of weapons on him. For his safety and my safety he was handcuffed until I could determine the nature of the call.
 {¶ 51} "Q. When you handcuffed him, what was the next thing you did?
 {¶ 52} "A. After handcuffing him, I asked him if he had any knives, needles, any type of weapon that I needed to be aware of before I conducted a pat-down for officer safety.
 {¶ 53} "Q. And did he respond when you made — when you asked that question?
 {¶ 54} "A. Yes, he did.
 {¶ 55} "Q. And what did he tell you?
 {¶ 56} "A. He stated that he had a piece of crack cocaine in his right front pocket."
 {¶ 57} Thereupon, Clark administered Miranda warnings, and retrieved what was later determined to be crack cocaine from Ford's pocket. Ford was charged with possession of crack cocaine. He moved to suppress the evidence, contending that it was obtained as the result of an unlawful search and seizure.
 {¶ 58} Following a hearing, Ford's motion to suppress was denied. Thereafter, he pled no contest, was found guilty as charged, and was sentenced accordingly. From his conviction and sentence, Ford appeals.
 II {¶ 59} Ford's sole assignment of error is as follows:
 {¶ 60} "The trial court erred by overruling Mr. Ford's motion to suppress evidence recovered as a result of the illegal seizure and search of his person."
 {¶ 61} Ford first appears to be contending that Clark had no proper basis for stopping him. However, Clark testified that he personally observed Ford walking on Interstate 75. This gave Clark a reasonable and articulable suspicion that Ford had violated R.C. 4511.051(A), which prohibits pedestrians from occupying the right-of-way of a freeway except under certain circumstances — for example, as a result of an emergency caused by an accident or breakdown of a motor vehicle, or to obtain assistance. It might be that upon further investigation, Clark would have determined that Ford's presence on the Interstate 75 right-of-way was justified by one of the exceptions in the statute, but Clark had a reasonable and articulable suspicion justifying a brief investigative stop.
 {¶ 62} When Ford began running away from Clark, Clark's suspicions understandably increased. In State v. Andrews (1991), 57 Ohio St.3d 86, a mere inference that a running man was running away from the police was deemed to be sufficient, together with the time of day and the high-crime nature of the area, to justify an investigative stop and a protective pat-down for weapons. In the case before us, Clark could see plainly that Ford was running away from him — that was not the subject of an inference. Also, although the time of day was not particularly suspicious, Clark testified from his personal knowledge that the area was one in which drug and prostitution crimes had been committed, arrests had been made, and weapons were recovered. Under these circumstances, we conclude that Clark could properly stop Ford and conduct a weapons frisk for his own safety.
 {¶ 63} The State contends, and the trial court agreed, that Ford was not in custody for purposes of Miranda v. Arizona, supra, when he was asked whether he had any weapons on his person, even though he was handcuffed. The State cites State v. Kimble (January 5, 2001), Montgomery App. 18497, for that proposition. In that case, as in the case before us, a suspect had been apprehended, taken to the ground and handcuffed. The issue in that case, as well as in State v. Whitfield (November 1, 2000), Mahoning App. No. 99-CA-111, upon which it relied, was whether the defendant's person had been unlawfully seized — that is, whether there had been an unlawful arrest. The issue in the case before us is the somewhat different one of whether a person is in custody for purposes ofMiranda v. Arizona, supra. That issue is determined by an objective test — would a reasonable person believe, based on all the circumstances, that he is under arrest or its equivalent. Stansbury v.California (1994), 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293.
 {¶ 64} In the case before us, Ford was chased and apprehended by a police officer. He was then "taken to the ground" and handcuffed. The argument that a reasonable person in that situation would believe himself to be in custody is compelling. However, we need not resolve this issue.
 {¶ 65} Even if we assume that Ford was in custody when he was asked whether "he had any knives, needles, [or] any type of weapon" on his person, his subsequent statement "that he had a piece of crack cocaine in his right front pocket," was not responsive to that question, and was therefore not the product of a Miranda violation, but was instead a volunteered statement. Thereafter, of course, Clark had probable cause to search Ford's pocket for crack cocaine.
 {¶ 66} Ford contends that his statement that he had crack cocaine in his pocket was not voluntary, but was made in recognition of the fact that Clark was going to be patting him down for weapons. As we have indicated, however, we conclude that Clark could properly perform a weapons pat-down under all of the circumstances. Therefore, even if Ford's statement was the fruit of Clark's announced intent to frisk him for weapons, it was not the fruit of a poisoned tree, since Clark could properly frisk Ford for weapons.
 {¶ 67} Ford's sole assignment of error is overruled.
 III {¶ 68} Ford's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
BROGAN and YOUNG, JJ., concur.